# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fiber Optic Designs, Inc. and
Holiday Creations, Inc.,

                          Plaintiffs,

                                        Civ. No. 05-660 (RHK/JSM)
                                        **MEMORANDUM OPINION
                                        AND ORDER**

v.

Seasonal Specialties, LLC,

                          Defendant.

Thomas P. Swigert and F. Matthew Ralph, Dorsey & Whitney, LLP, Minneapolis, Minnesota, and Gregory S. Tamkin and Scott P. Sinor, Dorsey & Whitney, LLP, Denver, Colorado, for Plaintiffs.

Randall T. Skaar and Aaron W. Davis, Patterson, Thunete, Skaar & Christensen, PA, Minneapolis, Minnesota, for Defendant.

## Introduction

This is a patent infringement suit brought by Plaintiffs Fiber Optic Designs, Inc. and Holiday Creations, Inc. (together, "Plaintiffs") against Defendant Seasonal Specialties, LLC. Plaintiffs have moved for a preliminary injunction to prohibit Seasonal Specialties from selling, offering to sell, or manufacturing allegedly infringing light emitting diode ("LED") light strings. Seasonal Specialities resists this motion on several

grounds, including non-infringement and patent invalidity.  For the reasons set forth

below, the Court will deny Plaintiffs' Motion For Preliminary Injunction.[1]

## Background

This case involves United States Patent No. 6,830,358 (the "'358 patent").  This

patent relates to decorative LED light strings commonly used to decorate Christmas trees.

(See '358 patent, col. 1, ll. 45-50.)  Fiber Optic is the assignee of the '358 patent and

Holiday Creations is the exclusive worldwide licensee.  (See Mem. in Supp. Ex. 2; Allen

Decl. ¶ 2; Second Hayes Decl. ¶ 3.)  Holiday Creations and Defendant Seasonal

Specialities both sell LED light strings.  LEDs are used as a lighting source for many

reasons, such as a relatively long lifespan; favorable physical properties, including

ruggedness, cool operation, and ability to operate in various temperatures; an array of

colors; energy efficiency; and cost effectiveness. (See '358 patent, col. 1, ll. 25-45.)

The '358 patent was issued on December 14, 2004.  It is a continuation of the

application for United States Patent No. 6,461,019 filed on March 29, 2001 (the "'019

patent application"), which is a continuation-in-part of application 09/378,631 abandoned

on March 18, 2001 (the "'631 application"), which is a continuation-in-part of application

09/339,616 filed on June 24, 1999 (the "'616 application"), which is a continuation-in-

part of application 09/141,914 filed on August 28, 1999 (the "'914 application").  (See

---

[1] Plaintiffs have also filed a Motion for Leave to File Newly Discovered Evidence In Support of Motion for Preliminary Injunction.  (Doc. No. 43.)  The Court will grant that Motion.

'358 patent, col. 1, ll. 7-20; Davis Decl. Ex. A at 2.)  The '358 patent also claims the

benefit of provisional application 60/119,804 filed on February 12, 1999 (the "'804

provisional application").  (See '358 patent, col. 1, ll. 19-20.)  During the prosecution of

the '019 patent application, the patent examiner advised Fiber Optic that the '019 and

'631 applications were not co-pending because the '019 patent application was filed on

March 29, 2001, while the '631 application had been abandoned on March 18, 2001.

(See Davis Decl. Ex. A at 2.)

Plaintiffs allege that Defendant's light strings infringe Claims 1, 2, 5, 6, and 16 of

the '358 patent.  (Mem. in Supp. at 7.)  Claim 1 is an independent claim, while claims 2,

5, 6, and 16 are dependent upon Claim 1.  The asserted claims read as follows:

> 1.  A light string comprising:
>> a predetermined number of light emitting diodes (LEDs) and
>>> sockets forming individual electrical components
>>> electrically coupled in series to form at least one series
>>> block, each electrical component defining individual
>>> alternating current average drive voltages, the series
>>> block having a first electrical component and a last
>>> electrical component, and
>> an alternating current electrical power supply having an
>>> average supply voltage,
>> wherein a summation of said individual alternating current
>>> average drive voltages is substantially equal to said
>>> average supply voltage.
>
> 2.  The light string of claim 1, where said first electrical component is
> directly coupled intermediate a source end and a terminal end of a first set
> of wires and the last electrical component directly coupled intermediate the
> source end and the terminal end of a second set of wires, the light string
> being free from additional circuitry intermediate the first electrical
> component and the source end of the first set of wires, between each of the

electrical components, and intermediate the last electrical component and the source end of the second set of wires, and

> wherein a first connector is coupled to both the source end of the first set of wires and the source end of the second set of wires which connector facilitates a direct connection between the first electrical component and a first side of said alternating current electrical power supply, and the last electrical component and a second side of the alternating current electrical power supply. . . .

5. The light string of claim 1, wherein said individual alternating current drive voltages of at least two of said electrical component is substantially different.

6. The light string of claim 1, wherein the supply voltage (Vrms) follows the following relationship in order to determine the predetermined number of LEDs:

$$Vrms \#3 \; Vave \; (n, m)$$
$$n$$

where m is a diode type and n is the predetermined number. . . .

16. The light string of claim 1, wherein the light string further comprises a plurality of series blocks.

('358 patent, col. 16, l. 64-col. 17, l. 25; id., col. 17, ll. 32-43; id., col. 18, ll. 13-14.)

The Summary of the Invention found in the patent's specification states that the patented invention relates to a light string which includes a pair of wires connected to a standard household AC electrical plug; LEDs powered by the wires and electrically coupled in a series to form at least one series block (if multiple series blocks are employed, they are electrically coupled in parallel); and a standard household AC socket at the opposite end for connecting light strings end-to-end. (See '358 patent, col. 1, l. 62-col. 2, l. 3.)

4

The specification notes that prior art LED light strings have had to use power converters to convert alternating current ("AC") power, commonly provided by standard outlets, to direct current ("DC") power.  (See '358 patent, col. 1, ll. 52-60; Allen Decl. ¶ 3.)  However, power converters are inefficient because they typically create heat, waste electricity, and limit the number of lights that can be stringed together.  (See Allen Decl. ¶ 3.)  Therefore, an object of the '358 patent is "to provide a method and preferred embodiment that matches the AC voltage rating of the LEDs coupled in series to the AC power input without the need for additional power conversion."  ('358 patent, col. 2, ll. 4-7.)

The specification also notes that "[m]any current-limiting designs" use an impedance element such as a resistor between the LED network and the power supply to limit voltage.  (See '358 patent, col. 8, ll. 35-50.)  At various points, the specification states that in order to directly drive a network of diodes "without current-limiting circuitry," "the voltage of each series block of diodes must be matched to the input source voltage."  (Id., Abstract; see id., col. 9., ll. 14-16.)  It further asserts that "FIG 10 shows the preferred embodiment of the invention, wherein a network of diodes, consisting of LEDs, is directly driven by the AC source without any current-limiting circuitry."  (Id., col. 8, ll. 51-54.)  Similarly, it states that "[t]he invention in FIG. 10 may have additional circuitry . . . to perform functions other than current-limiting. . . .  The only vital feature of the diode network is that all diodes are directly driven from the AC power source, without any form of current-limiting circuitry."  (Id., col. 9, ll. 1-3, 10-13.)  Furthermore,

5

the specification asserts that testing "verified conclusively that the decorative LED light strings were designed to be highly reliable by the direct AC drive method, without the use of any current-limit[ing] circuitry." (Id., col. 16, ll. 53-56.)

At the motion hearing, Plaintiffs' counsel elaborated on the prior art.  He said that "[p]rior art talked about adding up the DC summations, it didn't work, you put in a resistor and you made a best guess as to how to solve the problem." (Audio Tape: Oral Argument 6/22/05.)  In addition, when talking about the specification's references to "without current-limiting circuitry," he stated,

> What they are talking about there is they're talking about in the prior art, here's what you were doing, when you didn't use a transformer you used this methodology where you'd subtract out a certain number of LEDs and when you subtracted out the certain number of LEDs, you put in a resistor. It wasn't a perfect system, it didn't really work that well, but that's what the old methodology was talking about.

(Id.)

At the time the '358 patent was issued on December 14, 2004, Fiber Optic knew of Defendant's sales of allegedly infringing products.  (See Altamura Decl. ¶ 3.)  Holiday Creations first learned of Defendant's allegedly infringing sales (to Target Corporation) in February 2005.  (See Second Hayes Decl. ¶ 5.)  Plaintiffs filed suit on March 31, 2005. Their Motion for Preliminary Injunction followed.

**Standard of Review**

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir.

1993).  A decision to grant or to deny a preliminary injunction is within the sound

discretion of the district court.  <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1338

(Fed. Cir. 2003).  As the moving parties, Plaintiffs are required to establish their right to a

preliminary injunction in light of four factors: (1) a reasonable likelihood of success on

the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of

hardships; and (4) the impact of the injunction on the public interest.  <u>Purdue Pharma L.P.

v. Boehringer Ingelheim GMBH</u>, 237 F.3d 1359, 1363 (Fed. Cir. 2001).  Although there

are four factors, "a movant cannot be granted an injunction unless it establishes <u>both</u> of

the first two factors, i.e., likelihood of success on the merits and irreparable harm."

<u>Amazon.com, Inc. v. Barnesandnoble.com, Inc.</u>, 239 F.3d 1343, 1350 (Fed. Cir. 2001)

(emphasis in original); <u>see</u> <u>Jack Guttman, Inc. v. Kopykake Enters., Inc.</u>, 302 F.3d 1352,

1356 (Fed. Cir. 2002) ("[A] trial court may . . . deny a motion [for a preliminary

injunction] based on a patentee's failure to show any one of the four factors—especially

either of the first two—without analyzing the others.").

**Analysis**

**A.    Likelihood of Success on the Merits**

With respect to the first factor, Plaintiffs must show that, in light of the

presumptions and burdens that will inhere at trial on the merits, (1) they will likely prove

infringement and (2) their infringement claim will likely withstand Defendant's

challenges to the validity and enforceability of the patent.  Purdue Pharma, 237 F.3d at

1363.  If Defendant defends with evidence raising a "substantial question" concerning

infringement, validity, or enforceability, Plaintiffs must produce countervailing evidence

demonstrating that these defenses "lack[] substantial merit."  Id. (citation omitted).

**1.    Infringement**

An infringement analysis entails two steps.  The first step is determining the

meaning and scope of the patent claims asserted to be infringed.  The second step is

comparing the properly construed claims to the device accused of infringing.  Purdue

Pharma, 237 F.3d at 1363-64.  Claim construction is a question of law, while

infringement is a question of fact.  Id. at 1364.  To prove infringement, the patentee must

show that the accused device meets each claim limitation, either literally or under the

doctrine of equivalents.[2]  Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1367

(Fed. Cir. 2004).  The infringement analysis must be performed on a claim-by-claim

basis.  Amazon.com, 239 F.3d at 1351.

---

[2] Only literal infringement is at issue in this Motion, as Plaintiffs do not assert the
doctrine of equivalents as a basis for infringement.

8

On the instant Motion, only Claim 1 of the '358 patent is at issue. This is because Claim 1 is the sole independent claim alleged to have been infringed, and if it is not infringed, the claims that depend upon it are not infringed. See Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1383 (Fed. Cir. 2000). In addition, only the third element of Claim 1 is at issue because it is only part of Claim 1 (not to mention the only part of the '358 patent) that Defendant argues it has not infringed. (See Mem. in Opp'n at 6-9.) The third element of Claim 1 provides: "wherein a summation of said individual alternating current average drive voltages is substantially equal to said average supply voltage." ('358 patent, col. 17, ll. 7-9.)

Plaintiffs contend that this language means that "when the average drive voltages (that is, the amount of voltage to make each of the socket/LED combinations emit light) is added together, that number substantially equals the average voltage being supplied to the light string (i.e., from the wall outlet)." (Mem. in Supp. at 10.) They assert that Defendant's light strings literally infringe Claim 1 because testing reveals that the sum of the individual AC average drive voltages for electrical components in each series block of Defendant's strings is substantially equal to the average supply voltage. (Id. at 10-11 (citing Allen Decl. ¶¶ 5-7).)

Defendant responds that the third element of Claim 1 does not cover light strings containing current-limiting circuitry such as resistors. (See Mem. in Opp'n at 6-7.) The specification to the '358 patent states that "[m]any current-limiting designs" use an impedance element such as a resistor or other "current-limiting circuitry" between the

9

LED network and the power supply to limit voltage.  (See '358 patent, col. 8, ll. 35-50.)

In support of its argument, Defendant relies upon the following statements from the

specification:

- "In order to directly drive a network of diodes without current-limiting circuitry, the voltage of each series block of diodes must be matched to the input source voltage."  ('358 patent, Abstract (emphasis added).)

- "FIG 10 shows the preferred embodiment of the invention, wherein a network of diodes, consisting of LEDs, is directly driven by the AC source without any current-limiting circuitry."  ('358 patent, col. 8, ll. 51-54 (emphasis added).)

- "The invention in FIG. 10 may have additional circuitry. . . to perform functions other than current-limiting. . . .  The only vital feature of the diode network is that all diodes are directly driven from the AC power source, without any form of current-limiting device."  ('358 patent, col. 9, ll. 1-3, 10-13 (emphasis added).)

- "In order to directly drive a network of diodes without current-limiting circuitry, the voltage of each series block of diodes must be matched to the input source voltage."  ('358 patent, col. 9, ll. 14-16 (emphasis added).)

- "All these tests [discussed in the specification] verified conclusively that the decorative LED light strings were designed to be highly reliable by the direct AC drive method, without the use of any current-limit[ing] circuitry." ('358 patent, col. 16, ll. 53-56 (emphasis added).)

(See Mem. in Opp'n at 6, 9.)

Based on the specification, Defendant argues that Plaintiffs "specifically

surrendered the use of current limiting devices, such as resistors, in the specification, in

particular by stating that it was 'vital' to the invention to construct and operate the string

of LEDs without current-limiting circuitry."  (Mem. in Opp'n at 9.)  Defendant asserts

that "all claims of the '358 patent are prohibited from covering devices that use any type

10

of current limiting circuitry." (Id.)  Defendant concludes that its light strings do not literally infringe because they contain current limiting circuitry in the form of resistors. (Id. at 6-7 (citing Higman Decl. pp. 8-13).)

Plaintiffs reply with several counterarguments.  First, they argue that Defendant is improperly reading in a current-limiting device limitation that does not exist in the plain language of the third element of Claim 1.  Second, they assert that neither the specification nor the prosecution history contains a clear and unequivocal surrender of claim scope sufficient to construe the third element as not covering the use of circuit-limiting devices.  Finally, they contend that the circuit-limiting device limitation appears in Claim 2, not Claim 1, and that Defendant's attempt to import Claim 2's limitation into Claim 1 violates the doctrine of claim differentiation.  (See Reply Mem. at 5-10.)

Given the arguments raised by the parties, the question confronting the Court is narrow: Does the patent's specification limit the scope of the third element of Claim 1 to light strings that do not contain current-limiting devices?  Because this is a preliminary injunction motion, however, the Court need only determine whether Defendant's defense raises a "substantial question" concerning infringement and, if so, whether Plaintiffs have shown that Defendant's defense "lack[s] substantial merit."  Purdue Pharma, 237 F.3d at 1363.

Resolving these questions implicates the "twin axioms" concerning the role of the specification in claim construction.  Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004).  On the one hand, claims must be read in view of the specification

11

of which they are a part.  Id.  One purpose for examining the specification is to determine

if the patentee has limited the scope of the claims.  Watts v. XL Sys., Inc., 232 F.3d 877,

882 (Fed. Cir. 2000).  On the other hand, it is improper to read a limitation from the

specification into the claims.  Liebel-Flarsheim, 358 F.3d at 904.  As the Federal Circuit

has recognized, "there is sometimes a fine line between reading a claim in light of the

specification, and reading a limitation into the claim from the specification."  Comark

Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).

Invoking the first of the twin axioms, Defendant relies on SciMed Life Sys., Inc. v.

Advanced Cardiovascular Sys., Inc., 242 F.3d 1337 (Fed. Cir. 2001).[3]  (See Mem. in

Opp'n at 8-9.)  In SciMed, the Federal Circuit held that

> [w]here the specification makes clear that the invention does not include a
> particular feature, that feature is deemed to be outside the reach of the
> claims of the patent, even though the language of the claims, read without
> reference to the specification, might be considered broad enough to
> encompass the feature in question.

242 F.3d at 1341.  The SciMed court concluded that the specification "ma[d]e clear" that

the claimed invention used coaxial lumens (or passageways), rather than side-by-side

lumens.  Id. at 1345.  The court read the claim narrowly based upon several statements in

the specification.  First, the abstract identified the inflation lumen as "annular" or coaxial.

Id. at 1342.  Second, the specification distinguished the prior art on the basis of the use of

dual lumens and pointed out the advantages of the coaxial lumens.  Id. at 1342-43.  Third,

---

[3] Defendant also cites Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1370
(Fed. Cir. 2003), which followed SciMed's reasoning.  (Mem. in Opp'n at 9.)

the specification characterized the coaxial configuration as part of the "present

invention." Id. at 1343.  Finally, the specification stated that the coaxial lumen structure

was used in "all embodiments of the present invention contemplated and disclosed

herein." Id.  Thus, the Federal Circuit concluded that the patent presented "a clear case of

disclaimer of subject matter that, absent the disclaimer, could have been considered to fall

within the scope of the claim language." Id. at 1344.

SciMed relied on several cases.  In Watts v. XL Systems, Inc., 232 F.3d 877 (Fed.

Cir. 2000), the disputed claim concerned pipe joints that could be "sealingly connected."

Id. at 882.  The Federal Circuit limited the claim to connections effected by misaligned

taper angles based upon the specification.  The court noted that the specification "only

describes one method" to achieve the sealing connection, which was to misalign the taper

angles of the pipe threads. Id. at 883.  The court also observed that the specification,

which stated that "'[t]he present invention utilizes [the varying taper angle] feature,'"

actually limited the invention to structures utilizing misaligned taper angles. Id.  Finally,

the court pointed out that the specification "does not explicitly discuss an embodiment

without misaligned taper angles." Id.

In Cultor Corp. v. A.E. Staley Manufacturing Co., 224 F.3d 1328 (Fed. Cir. 2000),

the claimed method referred broadly to dissolving polydextrose in water. Id. at 1330-31.

The Federal Circuit limited the claim to a process using citric acid, even though the

claims themselves did not refer to citric acid. Id. at 1331.  The court noted that the

specification stated that the water-soluble polydextrose "specifically refers" to a

purification process that used a citric acid catalyst. Id. at 1330-31. In light of this specific reference, the court held that the patentee "explicitly limit[ed]" the subject matter of its patent to that using a citric acid catalyst, and "effected a disclaimer of the other prior art acids." Id.

In Toro Co. v. White Consolidated Industries, Inc., 199 F.3d 1295 (Fed. Cir. 1999), the patented device was a hand-held convertible vacuum-blower for vacuuming and blowing yard debris. Id. at 1297. In the claimed device, the cover was fitted with a ring that restricted the size of the air inlet when the device was in blower mode. One question was whether the cover, which the claim characterized as "including" a restriction ring, had to be permanently attached to the restriction ring. See id. at 1300-02. The Federal Circuit found that it had to be permanently attached. Id. at 1302. First, the drawings showed the ring as part of and permanently attached to the cover, and did not illustrate or describe any other structure. Id. at 1301. Additionally, the specification described the restriction ring as "built[] . . . as a part of the air inlet cover," and described the advantages of the unitary structure as "important to the invention." Id.

In Wang Laboratories, Inc. v. America Online, Inc., 197 F.3d 1377 (Fed. Cir. 1999), the disputed claim term was "frame" used in the context of an online computer information system. Id. at 1381. While "frame" could be applied both to "bit-mapped display systems" and to "character-based systems," the Federal Circuit limited the term to character-based systems in light of the specification. Id. at 1382. The court noted that "the only system that is described and enabled" in the specification and drawings "uses a

14

character-based protocol," and that references to bit-mapped protocols did "not describe them as included in the applicant's invention, and that the specification would not be so understood by a person skilled in the field of the invention."  Id.

Finally, in O.I. Corp. v. Tekmar Co., 115 F.3d 1576 (Fed. Cir. 1997), the patentee argued that the term "passage," in the context of an apparatus that removed water vapor from a sample to be analyzed by a gas chromatograph, should encompass a smooth-walled, cylindrical structure.  Id. at 1581-82.  The Federal Circuit rejected patentee's construction in light of the specification.  It noted that "[a]ll of the 'passage' structures contemplated by the written description [were] either non-smooth or conical."  Id. at 1581.  In addition, the court observed that "the [written] description expressly distinguishes over prior art passages by stating that those passages are generally smooth-walled."  Id.  Therefore, the court concluded, "one skilled in the art reading the claims, description, and prosecution history would conclude that the term 'passage' . . . does not encompass a smooth-walled, completely cylindrical structure."  Id.

The analysis in these cases is directly applicable to the claim construction issue presented in this case.  Defendant argues that its light strings contain resistors and therefore cannot infringe the '358 patent because the specification limits the patent's scope to light strings that do not contain current-limiting circuitry.  At various points, the specification indicates that the claimed invention directly drives a network of diodes "without current-limiting circuitry."  Reading the specification in light of SciMed and the cases it relied upon, the Court finds that Defendant has raised a "substantial question" as

15

to whether the scope of the '358 patent is limited by the specification and, if so limited, whether Defendant's light strings are infringing.  Purdue Pharma, 237 F.3d at 1363.

First, from the outset, the specification identifies the so-called "voltage matching requirement" as an alternative to driving a network of diodes with current-limiting circuitry.  The Abstract states that "[i]n order to directly drive a network of diodes without current-limiting circuitry, the voltage of each series block of diodes must be matched to the input source voltage."  ('358 patent, Abstract (emphasis added).)  See SciMed, 242 F.3d at 1342 (observing the limiting language of a patent abstract).  This exact statement is repeated later in the specification.  (See '358 patent, col. 9, ll. 14-16.) Echoing this sentiment, Defendant's expert states that "the alternative approach" to matching the voltage of each series block of diodes to the input source voltage "is to insert a current limiting device, typically a simple resistor, into the circuit."[4]  (Higman Decl. p. 6.)

Second, the specification distinguishes the prior art on the basis of current-limiting circuitry.  For example, immediately following the discussion of "[m]any current limiting designs" that use current-limiting circuitry, the specification states that "FIG. 10 shows

---

[4] Plaintiffs concede that "[b]y determining and summing the AC average drive voltages of the individual electrical components, the '358 Patent constructs an LED light string that does not require current limiting resistors."  (Mem. in Supp. at 12.)  They hasten to add, however, that "[t]his does not . . . mean that the '358 Patent does not cover LED light strings incorporating resistors" because summing the AC average drive voltages "is a patentable concept wholly separate and distinct from whether or not there is a current limiting resistor."  (Id.)  On this last point, the Court finds that a substantial question exists given the language of the specification.

the preferred embodiment of the invention, wherein a network of diodes, consisting of

LEDs, is directly driven by the AC source <u>without any current-limiting circuitry</u>."  ('358

patent, col. 8, ll. 51-54 (emphasis added).)  Furthermore, Plaintiffs' counsel similarly

distinguished the prior art on the basis of resistors.  He stated that the "[p]rior art talked

about adding up the DC summations, it didn't work, <u>you put in a resistor</u> and you made a

best guess as to how to solve the problem."  (Audio Tape: Oral Argument 6/22/05

(emphasis added).)  These discussions support Defendant's contention that '358 patent

should not be read so broadly as to encompass the distinguished prior art designs.  <u>See</u>

<u>SciMed</u>, 242 F.3d at 1343; <u>O.I. Corp.</u>, 115 F.3d at 1581; <u>see also</u> <u>Ekchian v. Home Depot,</u>

<u>Inc.</u>, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed

invention over the prior art, an applicant is indicating what the claims do not cover, he is

by implication surrendering such protection.").  While Plaintiffs would like to distinguish

the prior art only on the basis that it used DC summations (and power converters), they

have not persuaded the Court to ignore the prior art's apparent use of resistors, and ignore

the specification's repeated references to driving LEDs "without current-limiting

circuitry."[5]

Third, the specification indicates that the lack of current-limiting circuitry is a vital

part of the invention.  For example, it states that "[t]he invention in FIG 10 may have

---

[5] Defendant contends that the prior art also teaches the use of AC driven LEDs that contain resistors.  (Mem. in Opp'n at 9-10.)  Defendant asserts that if the '358 patent was construed to cover light strings that contained resistors, the patent would be invalid in light of the prior art.  The Court will discuss this argument below.  <u>See</u> <u>infra</u> n.7.

additional circuitry . . . to perform functions <u>other than current-limiting</u>." ('358 patent, col. 9, ll. 1-3 (emphasis added).) At the end of the same paragraph, it concludes by saying that "[t]he only <u>vital</u> feature of the diode network is that all diodes are directly driven from the AC power source, <u>without any form of current-limiting circuitry</u>." (<u>Id.</u>, col. 9, ll. 10-13 (emphasis added).) As in <u>SciMed</u> and <u>Watts</u>, the characterization of "[t]he invention" as capable of having additional circuitry to perform functions other than current-limiting is strong evidence that the third element should not be read to encompass current-limiting devices. See <u>SciMed</u>, 242 F.3d at 1343; <u>Watts</u>, 232 F.3d at 883. Furthermore, similar to <u>Toro Co.</u>, where the claim was limited based in part on statements in the specification describing a particular structure as "important to the invention," the specification here states that it is "vital" that all diodes are driven without current-limiting circuitry. See <u>Toro Co.</u>, 199 F.3d at 1301.

Fourth, the repetition of the words "without current-limiting circuitry" bolsters the argument that Plaintiffs have explicitly and unequivocally disclaimed light strings with current-limiting technology. There is no suggestion that the patentee made these statements unaware of light strings that use resistors, as the patentee discusses resistors in the specification. See <u>SciMed</u>, 242 F.3d at 1344. This repetitious language, it can be argued, "effected a disclaimer" of the use of prior art resistors. <u>Cultor</u>, 224 F.3d at 1331.

Finally, there exists a substantial question as to whether the only device described and enabled in the specification is a light string that does not contain current-limiting circuitry. See <u>Watts</u>, 232 F.3d at 883; <u>Toro Co.</u>, 199 F.3d at 1301; <u>Wang</u>, 197 F.3d at

18

1382; <u>O.I. Corp.</u>, 115 F.3d at 1581.  It is questionable whether one skilled in the art

reading the claim and specification would conclude that the light string encompasses a

device with current-limiting circuitry.  <u>See Wang</u>, 197 F.3d at 1382; <u>O.I. Corp.</u>, 115 F.3d

at 1581.

Because Defendant has raised a substantial question regarding infringement, it is

Plaintiffs burden to show that Defendant's defense lacks substantial merit.  They have not

done so.  First, although they contend that Defendant is improperly reading a limitation

from the specification into the claim, the Court has explained above why this is not

necessarily the case.  Second, Plaintiffs baldly claim that there is no clear and

unequivocal surrender of claim scope in the specification.  Again, the Court finds a

substantial question exists on this point.  At the motion hearing, Plaintiffs attempted to

distinguish <u>SciMed</u> on the ground that the Federal Circuit read the disputed claim

narrowly because the specification said that "all embodiments of the present invention

contemplated and disclosed herein" used a particular structure.  <u>See SciMed</u>, 242 F.3d at

1343.  However, this was not the only basis for <u>SciMed</u>'s decision, and none of the cases

<u>SciMed</u> relied on (which this Court relies on also) contained patent specifications with

such language.

Finally, Plaintiffs argue that Defendant's construction violates the doctrine of

claim differentiation by importing a limitation from Claim 2 to Claim 1.  Under the

doctrine of claim differentiation, "each claim in a patent is presumptively different in

scope."  <u>RF Delaware, Inc. v. Pacific Keystone Techs., Inc.</u>, 326 F.3d 1255, 1263 (Fed.

19

Cir. 2003) (citation and internal quotations omitted).  Although "not a hard and fast rule of construction," the doctrine applies where "there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims."  Id. (citation and internal quotations omitted).  In this case, however, the applicability of this doctrine is not apparent, as Plaintiffs have not demonstrated that the limitation in Claim 2 is the "only meaningful difference" between it and Claim 1.  Moreover, the doctrine "does not serve to broaden claims beyond their meaning in light of the specification . . . and does not override clear statements of scope in the specification."  Toro Co., 199 F.3d at 1302; see Wang, 197 F.3d at 1384; O.I. Corp., 115 F.3d at 1582.

Because Defendant has presented a substantial question concerning infringement which has not been shown to lack substantial merit, the Court concludes that Plaintiffs have not demonstrated that they will likely prove infringement.  See Purdue Pharma, 237 F.3d at 1363.  Accordingly, this factor weighs against issuing a preliminary injunction.

### 2.     Validity and Enforceability

Defendant has put forth four invalidity arguments, three[6] of which raise the issue of the priority date of the '358 patent.[7]  (See Mem. in Opp'n at 9-14.)  This date is critical because Plaintiffs only contest Defendant's calculation of that date; they do not dispute the invalidity arguments based on that date.  (See Reply Mem. at 3, 13, 15.)  Section 120 of Title 35 sets forth the requirements for a patent application to receive the benefit of the

---

[6] Defendant's three arguments relating to the priority date are that a related patent application is anticipatory prior art; that Plaintiffs sold patented light strings in violation of 35 U.S.C. § 102(b)'s on-sale bar; and that Plaintiffs failed to disclose a published Canadian patent as prior art.  (See Mem. in Opp'n at 10-14.)

[7] Defendant's fourth argument was mentioned above.  See supra n.5.  Defendant argues that if the '358 patent is construed to cover light strings using resistors, then the patent would be invalid in light of prior art that teaches AC driven LEDs which contain resistors.  (See Mem. in Opp'n at 9-10.)  A patent cannot issue on an invention if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."  35 U.S.C. § 102(a); see Vison-Ease Lens, Inc. v. Essilor Int'l SA, 322 F. Supp. 2d 991, 996 (D. Minn. 2004).  Defendant cites United States Patent No. 4,298,869 (the "Okuno Patent"), which describes a LED display for traffic or road signs.  Claim 1 states, "[A LED] lamp comprising . . . a commercial AC power source . . . [and] a current-regulating means," which the specification notes "may be a resistor."  (Okuno Patent, col. 19, ll. 62-68 (emphasis added); see id., col. 2, ll. 43-46.)  Defendant's expert states that the Okuno Patent "described a . . . technique of using resistors or other current-limiting devices with AC driven LEDs to control current flow."  (Higman Decl. p. 8.)  Plaintiffs reply that "the prior art relates to LED strings having a number of LEDs determined according to their direct current ("DC") drive voltage values."  (Reply Mem. at 11 (emphasis in original).)  Plaintiffs' argument is not persuasive because it does not square with Claim 1 of the Okuno Patent which says "commercial AC power source."  In the Court's view of the current record, Plaintiffs have not sufficiently rebutted Defendant's argument on the teachings of the prior art.  Accordingly, the Court finds that Defendant has shown that the '358 would be vulnerable to a validity challenge if the patent was construed to cover current-limiting circuitry.  See Amazon.com, 239 F.3d at 1359 ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.").

earlier filing date of a prior application.  See 35 U.S.C. § 120; Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F.3d 1561, 1564 (Fed. Cir. 1997).  One requirement is that the applications must be co-pending, meaning that the later application was filed while the prior application was still pending.  See Cargill, Inc. v. Sears Petrol. & Trans. Corp., 334 F. Supp. 2d 197, 225 (N.D.N.Y. 2004); 4A Donald S. Chisum, Chisum On Patents, §§ 13.01, 13.05 (2004).

In this case, Defendant attacks the copendency requirement.  It contends that the priority date of the '358 patent is March 29, 2001 because there was a break in the chain of priority at one point where applications were not co-pending.  Its argument goes as follows: the '358 patent specifically recites the chain of applications preceding it; the '358 patent application was linked to the '019 patent application; the '019 patent application was linked to the '631 application; the '631 application was abandoned before the '019 patent application was filed; therefore, the '019 and '631 applications were not co-pending and the '358 patent can only relate back to the date the '019 patent application was filed, which was March 29, 2001.[8]  (See Mem. in Opp'n at 10-11; Davis Decl. Ex. J (chart).)  In sum, Defendant asserts that the priority date must be traced in the order recited in the patent and nothing can be skipped.

---

[8] Defendant notes that during the prosecution of the '019 patent application, the patent examiner rejected Fiber Optics's claim of priority to the '631 application, stating that the '019 patent application was not co-pending.  (See Davis Decl. Ex. A at 2.)

Plaintiffs trace the chain of priority of the '358 patent differently and respond that the priority date for the '358 patent is February 12, 1999. Their argument goes as follows: the '358 patent was linked to the '616 application, which was then pending; the '616 application was linked to the '804 provisional application, which was also then pending; therefore, the '358 patent can relate back to the date the '804 provisional application was filed, which was February 12, 1999.[9] (Reply Mem. at 12-15; Ex. 7 (chart).) In sum, Plaintiffs assert that section 120 does not require a linear chain of priority, even if a linear chain is recited in the patent, and the copendency element is met so long as an application is filed while another application is pending.

The parties have identified a novel issue of statutory and patent interpretation, and while the Court is tempted to weigh-in on this issue, it will not. As Plaintiffs noted at the motion hearing, there appears to be no Federal Circuit case law that directly addresses the current situation. Given the limited authority on the matter, the expedited nature of the preliminary injunction motion, and prior determination that Defendant has raised a substantial question regarding non-infringement, the Court declines to address the priority date issue and the invalidity arguments which flow from that date.

---

[9] Plaintiffs have informed the Court that after Defendant raised its priority date argument, Plaintiffs filed with the Patent and Trademark Office a "Petition to Accept Unintentionally Delayed Claim for the Benefit of a Prior Application and Certificate of Correction to Correct 35 U.S.C. § 120 Priority" for both the '019 and '358 patents. (See Reply Exs. 8, 8C.) Basically, Plaintiffs seek to amend their patents to draw a clearer line from the '804 provisional application to the '019 and '358 patents. (See id.) At the motion hearing, Plaintiffs asserted that filing the Petitions was an unnecessary precaution.

**B.    Irreparable Harm, Balance of the Hardships, and Public Interest**

Based on the determination that Plaintiffs have not shown a likelihood of success on infringement, Plaintiffs cannot be granted an injunction.  See Jack Guttman, 302 F.3d at 1356; Amazon.com, 239 F.3d at 1350; see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004) ("[A] district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.").  But for the sake of completeness, the Court will briefly address the final three factors of irreparable harm, balance of the hardships, and the public interest.

First, with respect to irreparable harm, irreparable harm cannot be presumed because Plaintiffs have not made a clear showing of infringement.  See Amazon.com, 239 F.3d at 1350; see Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991). Without the benefit of the presumption, Plaintiffs assert that if no preliminary injunction issues, they will suffer irreparable harm in several ways: (1) lost sales and market share; (2) Defendant's light strings are of lesser quality and customer's dissatisfaction with those lights will negatively impact the sales of Plaintiffs' lights; (3) it would be unfair to be forced to compete with Defendant because it "take[s] a free ride on [its] coat tails"; (4) Defendant's infringement would damage Plaintiffs' "reputation as the industry leader"; (5) a denial of an injunction "amounts to a compulsory license" which is inconsistent with patent law policy; and (6) money damages will not make them whole, as no one will ever know how many customers will have been lost as a result of Defendant's infringement

24

because "[m]any customers, disgusted with Defendant's inferior product, may simply choose not to buy LED lights again from anyone."  (Mem. in Supp. at 17-19.)

The Court finds that Plaintiffs have not demonstrated irreparable harm.  Although Plaintiffs contend that they will lose market share, "neither the difficulty of calculating losses in the market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."  Nutrition 21, 930 F.2d at 871 (citation omitted).  Moreover, despite the threatened lost sales to Target, Plaintiffs have not shown that money damages would be inadequate.  On the contrary, some evidence and a reasoned analysis for inadequacy must be offered, as "there is no presumption that money damages will be inadequate in connection with a motion for an injunction pendente lite."  Id. at 872.  Finally, assuming that Defendant's light strings are of lesser quality, Plaintiffs' contention that customer dissatisfaction with Defendant's "knockoffs" will adversely affect Plaintiffs' sales or reputation is supported more by speculation and attorney argument than evidence.  There is nothing in the record to suggest that a customer who buys Defendant's goods and finds them to be sub-par would then think less of Plaintiffs' products or decide not to buy LED light strings from anyone.[10]

---

[10] Defendant argues that Plaintiffs' licencing history and their three-and-a-half month delay in bringing suit undercuts a finding of irreparable harm.  (Mem. in Opp'n at 3-6.)  The Court need not address these arguments in light of the foregoing.

Second, with respect to the balance of the hardships, the balance weighs in favor of Defendant in light of Plaintiffs' weak showing of a likelihood of success.  See Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990) ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market can be devastating."); H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987) ("The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error.").

Finally, with respect to the public interest, while the public interest favors the protection of patent rights, Plaintiffs have not demonstrated that they are likely to show infringement.  Thus, the public interest in legitimate competition is served by denying a preliminary injunction.  See Illinois Tool Works, 906 F.2d at 684; Vision-Ease Lens, Inc. v. Essilor Int'l SA, 322 F. Supp. 2d 991, 999 (D. Minn. 2004) (Kyle, J.); Cargo Protectors, Inc. v. Am. Lock Co., 92 F. Supp. 2d 926, 935 (D. Minn. 2000) (Montgomery, J.); Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc., 822 F. Supp. 1437, 1449-50 (D. Minn. 1993) (Doty, J.).

## Conclusion

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Plaintiffs' Motion for Leave to File Newly Discovered Evidence In Support of Motion for Preliminary Injunction (Doc. No. 43) is **GRANTED**; and

2.      Plaintiffs' Motion for Preliminary Injunction (Doc. No. 3) is **DENIED.**[11]


Dated: July 1, 2005                                         S/ Richard H. Kyle
                                                            RICHARD H. KYLE
                                                            United States District Judge

---

[11] In accordance with Fed. R. Civ. P. 52(a), the foregoing Memorandum Opinion and Order are the Court's findings of fact and conclusions of law that constitute the grounds of its action.